## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| RACHEL STEWART and WILLIAM STEWART, | Case No. 18-CV-2114 (NEB/DTS) |
| Plaintiffs, | |
| v. | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| NORCOLD, INC., THETFORD CORPORATION, THE DYSON-KISSNER-MORAN CORPORATION, CAMPING WORLD, INC., and DOES 1-50, | |
| Defendants. | |

Plaintiffs Rachel and William Stewart filed this property damage and personal injury action against Norcold, Inc., Thetford Corporation, The Dyson-Kissner-Moran Corporation (together, the "Norcold Defendants"), as well as Camping World, Inc. ("Camping World"), and Does 1–50. [ECF No. 60-1 ("Compl.").] The action stems from a fire in Plaintiffs' recreational vehicle ("RV"). The fire was allegedly caused by the RV's refrigerator, which was manufactured by the Norcold Defendants and retrofitted for the RV by Camping World. The Norcold Defendants and Camping World now move for summary judgment.

# BACKGROUND

## I.   Product Recall, HTS Kit, and HTS Instructions

In October 2010, the Norcold Defendants recalled all refrigerators in its "1200 Series," including one installed in Plaintiffs' RV. [ECF No. 87-1.] As part of the recall, the Norcold Defendants developed a retrofit program whereby a High Temperature Sensor ("HTS") would be installed on the 1200 Series refrigerators. [ECF No. 87-2 ("Klein Dep.") at 49.][1] The HTS was designed to prevent a fire caused by an overheated refrigerator boiler tube by cutting off power if the temperature reached a set point. (*Id*. at 59, 68–69.)

Central to Plaintiffs' claims against Camping World is Camping World's installation of Norcold's HTS into Plaintiffs' RV refrigerator. Norcold's HTS kit included several parts and six pages of written instructions. [*See generally* ECF No. 87-3 ("HTS Instructions").] Among other information, the HTS Instructions lists the "Tools Needed," including an inch-pound torque wrench, and provides drawings of the HTS parts, including a thermocouple with a muffler clamp. (*Id*. at 1–2; Klein Dep. at 76–77 (testifying the thermocouple is attached with a stainless-steel muffler clamp).) Two of the steps to install the thermocouple are relevant here:

> 3. Position [thermocouple] around [heater tubes], [boiler] & [flue tube] so the sensor is against [boiler] and is even with or within 1" of the top of [heater tubes].
> 4. Tighten [thermocouple]. Torque to 23 in lbs.

---

[1] For citations to deposition transcripts, the pinpoint citations are to the deposition page numbers, rather than ECF page numbers.

(HTS Instructions at 3.) The instructions warn that "[i]mproper installation, adjustment, alteration, service or maintenance can cause injury or property damage." (*Id*. at 1.)

According to Norcold's corporate witness, the tools listed in the HTS Instructions were mandatory for proper installation of the HTS. (*See* Klein Dep. at 94.) Norcold intended installers to follow the torque instruction. (*Id*. at 97.) The purpose of using a torque wrench to 23 inch-pounds was to avoid overtightening the clamp, to ensure a proper fit up to the refrigerator boiler, and to ensure the thermocouple was attached securely but not overtightened. (*Id*. at 97–99.) An overtightened clamp might strip, crack, or break, depending on the strength of the steel. (*Id*. at 98.) Norcold's corporate witness also testified that if an installer used a nut driver instead of a torque wrench, they would be "violating" the HTS Instructions. (*Id*. at 99.) Norcold did not recommend that an installer bend and twist the clamp to get it to fit on the boiler tube. (*Id*. at 102.)

## II.     Replacement of the HTS on Plaintiffs' RV Refrigerator

Camping World was an authorized Norcold service and repair facility. It installed the HTS kits on existing Norcold 1200 Series refrigerators. It did not have a procedure or protocol to verify that its technicians followed the HTS Instructions. [ECF No. 87-4 ("Peabody Dep.") at 65–67.] Camping World technician Dick Divine ("Divine"), who was

aware of the HTS Instructions, installed some HTS kits. [ECF No. 87-5 ("Divine Dep.") at 53.][2]

In October 2013, Divine replaced the HTS on Plaintiffs' RV refrigerator. (*See* Peabody Dep. at 68–69; Divine Dep. at 69–70.) He used a manual nut driver to tighten the thermocouple clamp, rather than a torque wrench. (Divine Dep. at 70.) He tightened the clamp until the thermocouple had contact with the boiler tube and did not wiggle. (*Id*. at 70–71.) He estimated that he used 23 pounds of torque and "[was] sure it's not more," but he did not use a device to calibrate the amount of force used. (*Id*. at 71–72.) He deformed the round clamp to shape it around the boiler tube, bending the metal to get the clamp to fit. (*Id*. at 72–74.) Divine testified that he would have noticed if it had broken during installation. (*Id*. at 74.)

## III.    The RV Fire

In June 2016, Plaintiffs Rachel and William Stewart drove their RV to New Jersey for a family wedding and parked it at Rachel's brother's house. [ECF No. 60-4 ("Rachel Dep. I") at 33–39.] Rachel, William, and their minor niece slept in the RV the night of June 27, 2016. (*See id*. at 51.) Early the next morning, William left to drive someone to the airport. (*Id*. at 49, 51.) Around 5:30 or 6:00 a.m., Rachel and her niece woke up and joined family members in her brother's garage, which was being used as a gathering space for

---

[2] While Plaintiffs refer to Camping World's technician as Dick Devine, his deposition testimony indicates that his last name is spelled "Divine." (*See generally* "Divine Dep.") The Court will therefore refer to him as "Divine."

the weekend. (*Id*. at 66.) The family members present in those early morning hours were Rachel, her siblings, and their families, including fourteen minor children. (*Id*. at 66–69, 81.) Approximately 30 to 45 minutes later, Rachel heard a pop and hiss, and one of her siblings yelled, "fire." (*Id*. at 66–69, 74.) Rachel testified that she panicked because she did not know where all the children were. She helped her brother and sister gather the children, some of whom were in the garage and in her sibling's "Redwood" RV, which was parked next to the garage. (*Id*. at 69, 73–75; *see id*. Ex. 5.)

Rachel testified that she first saw the flames "[i]n front of the Redwood when you walked—exited the garage." (*Id*. at 71–72; *see also id*. at 84.) Rachel recalled "see[ing] the flames and the fire and the smoke in the air," and wanting to investigate where it was coming from and gather the children. (*Id*. at 73.)

Plaintiffs' RV was parked in the back of her brother's yard, behind and perpendicular to the side of the Redwood RV. (*See id*. at 39–40; *id*. Exs. 5, 6.) Rachel approached Plaintiffs' RV from the passenger side and continued to the front, looking for children. (*Id*. at 99–100.) When she rounded the corner of the RV, the flames were coming out of it "like a torch shooting out the back vent part of the refrigerator." (*Id*. at 85; *see also id*. at 99–101.) She also testified that the first time she noticed the flames and smoke coming from the RV was when she was in arm's length of them. (*Id*. at 104.) She noticed that the flames were shooting toward a propane tank, and became frantic because she thought it might explode and kill her family. (*Id*. at 101.) She ran to the neighbor's house

to bang on the window to alert him to the danger. (*Id*.) She then returned to her brother's garage where everyone was accounted for. (*Id*. at 105–06.)

No one was in Plaintiffs' RV at the time of the fire. (*Id*. at 80.) Rachel did not see any children next to the flames. (*Id*. at 75.) No one was physically injured by the fire. (*See id.* at 113.)

## IV.    Rachel's Emotional Distress and Medical Records

Rachel testified that her panic and fear were intense because she almost left her niece in the RV that morning. (Rachel Dep. I at 114–17.) She testified to having anxiety, flashbacks, nightmares, sleeplessness, inability to concentrate, depression, muscle contractions, stiffness, and weight gain. (*Id*. at 114, 117–18, 126–30.)

Neither Rachel's psychiatrist nor her clinical psychologist at HCMC was willing to provide expert testimony regarding her treatment or care, or whether her condition was caused by the RV fire. [ECF Nos. 60-11, 60-12.] Thus, the information regarding Rachel's medical condition is derived from her medical records from Hennepin County Medical Center ("HCMC") and her own testimony.

Rachel first visited HCMC several months after the fire, in January 2017, for a pre-operative appointment before plastic surgery. [ECF No. 66 ("Defs' Ex. F") at HCMC 9.] Rachel was found medically stable for the surgery. (*Id*. at HCMC 15.) The record states that the doctor "believe[d] she may benefit from seeing a psychiatrist prior to the surgery as it seems that she is struggling with the decision [to have surgery] and financial issues."

(*Id.* at HCMC 10.) It also notes that Rachel had a past medical history of anxiety, post-traumatic stress disorder ("PTSD"), and a "possible personality disorder." (*Id.* at HCMC 11.) Rachel requested a referral to "behavioral health." (*Id.* at HCMC 15.) The record of this visit does not mention the RV fire.

After her plastic surgery, Rachel was seen again at HCMC, this time for shoulder pain. She was diagnosed with bursitis. (Defs' Ex. F at HCMC 27–28.) The medical record from this visit notes that Rachel stated she had PTSD and anxiety. The record does not provide details about these diagnoses and does not mention the RV fire. (*Id.* at HCMC 28–29.) Rachel requested a prescription for a tranquilizer; this request was denied. (*Id.*)

In February 2017, Rachel met with a clinical psychologist at HCMC. Rachel presented concerns regarding anxiety. She reported that:

> she went home for a wedding in June 2016 and there was a fire in her RV. [She] had her 6 [year old] niece with her but luckily nobody was in the RV when the fire broke out. [She] reported sleep problem [*sic*], nightmares, anxiety, and feeling startled since the fire.

(*Id.* at HCMC 37.) At the same visit, Rachel "also reported that 8 years ago she had a 'traumatic' experience: death of a family member, miscarriage, and losing her home." (*Id.*) She "reported the following legal problems: 'the situation with the mobile home,' office audit, and a situation with the after care she received after having plastic surgery." (*Id.* at HCMC 38.) Rachel "identified the following current stressors: 'Audit, flashes from the fire, feeling overwhelmed, I can't stay focused, thinking of what could've happened in the fire.'" (*Id.*) The summary and conclusion section of the February 2017 medical

record states that Rachel met the criteria for "Generalized Anxiety Disorder with panic attacks" and "Other Specified Trauma- and Stressor-Related Disorder (full criteria for PTSD was not met)." (*Id*. at HCMC 40.) It also stated that Rachel was experiencing "[m]oderate psychosocial stress," and noted additional stressors of "[a]udit" and "flashes from the fire." (*Id*.)

In March 2017, Rachel was seen by HCMC psychiatrist Erica Mitchell, MD. (Defs' Ex. F at HCMC 44.) According to the medical record, Rachel reported "anxiety symptoms related to her memory of the fire [and] worrying about what else could happen in the future. Experiencing 'flashbacks,' which she describes as thinking back about what would happen if she didn't take niece out before the fire." (*Id*. at HCMC 45.) She also reported that she "works keeping books at her partner's construction company, which has been very stressful of late, with an IRS audit ongoing."[3] (*Id*.) Dr. Mitchell's "assessment and plan" states in part that Rachel:

---

[3] In October 2016, the Minnesota state government contacted William about failing to pay taxes, and subsequently conducted an audit. (*See* Rachel Dep. II at 279; ECF No. 60-7 ("William Dep.") at 8.) William testified that "Rachel dealt with the lawyers" and participated in the audit. (William Dep. at 8–9; *see* Rachel Dep. I at 9 (testifying she was the office manager for William's business).) In May 2018, the State of Minnesota filed a complaint against William alleging four felony counts and four gross misdemeanor counts of failing to pay Minnesota state income taxes for years 2012–2015. (William Dep. Ex. 20). William pleaded guilty to the four gross misdemeanor counts in January 2019. (*See* William Dep. at 7–8); *State v. Stewart*, No. 27-CR-18-12961 (Minn. Dist. Ct.). The Internal Revenue Service ("IRS") also investigated Williams and determined that he owed $1.3 million in past taxes. (William Dep. at 93 (testifying the IRS matter had been resolved).)

> [has a] history of anxiety, PTSD, now with increasing anxiety following a
> fire in her RV in June 2016 . . . . She seems to have history of significant
> anxiety in setting of stressors/loss, and this is again occurring for her. She is
> usually able to manage her stress well with careful attention to self-care and
> exercise. She is not able to do so at this time (due to increased demands of
> work, going through a tax audit) and is experiencing worsening of anxiety
> . . . . [S]he does not meet criteria for PTSD today . . . .

(*Id*. at HCMC 49). The record does not opine about the cause of Rachel's claimed
symptoms.

On May 1, 2017, Rachel met with an HCMC clinical social worker for a therapy
intake screening. (Defs' Ex. F at HCMC 57.) Rachel "explain[ed] that she feels most of her
current symptoms . . . started last June (2016) after her RV caught fire. She had her 6-year-
old niece [] with her. She states that luckily neither of them was in the trailer at the time
of the fire." (*Id*. at HCMC 58.) Rachel also reported that, two weeks after the RV fire, she
tried to deposit $40,000 in cash at the bank, but the bank teller took the money from her.
(*Id*.) Rachel stated that "[a]fter the fire and the loss of her money, . . . her mother almost
died but 'I saved her, I figured out the oxygen wasn't on.' She also report[ed] that in the
same year, her brother contemplated suicide but she talked him out of it." (*Id*.) Rachel
mentioned other prior trauma, including the death of her brother-in-law in a car accident,
infertility, a miscarriage, and the repossession of her truck. (*Id*.) The "screening
conclusion and plan" states in part that Rachel "reports experiencing a number of trauma
and stress related symptoms starting almost immediately after a fire in her RV one year
ago." (*Id*. at HCMC 61.)

Rachel met with Dr. Mitchell again on May 19, 2017. (*Id*. at HCMC 64.) She reported "feeling better since her last visit," but "[w]ork remains very stressful (IRS audit)." (*Id*.) She noted that she was "still experiencing some intrusive thoughts about the RV fire." (*Id*. at HCMC 65.)

On May 22, June 5, and June 26, 2017, Rachel met with HCMC clinical psychologist Danielle Potokar, PhD LP. The records from these appointments do not mention the RV fire or opine on the cause of Rachel's claimed symptoms. (*See* Defs' Ex. F at HCMC 75–76, 82–83, 89–90).

On July 12, 2017, Rachel met with Dr. Mitchell again. At that appointment, Rachel reported "feeling better, with greater ability to cope with stressors." (*Id*. at HCMC 96.) She was instructed to taper off her prescribed medication, and no follow-up visits were scheduled.[4] (*Id*. at 99.)

Rachel testified that she sought medical attention for an anxiety attack at the Herman Memorial Hospital in Houston, Texas, in January 2018. (Rachel Dep. I at 122–23.) The Memorial Hermann Health System has no record of her receiving treatment at the facility. [ECF No. 60-8.]

---

[4] Rachel visited HCMC again on October 4, 2018, complaining of a tightening sensation in her neck, chest, and left arm, swelling on the left side of her neck, and dizziness. (Defs' Ex. F at HCMC 107–09.) The record does not indicate that these symptoms were related to her anxiety or the RV fire. Rachel was examined and no follow-up was recommended.

## V.    The Lawsuit

This action was filed in state court and removed to federal court. The Complaint asserts several counts against the Norcold Defendants, including strict liability for design defect and failure to warn, negligence for post-sale duty to warn and duty to conduct adequate recall/retrofit, negligence per se, and fraud by concealment. The Complaint also asserts a negligence claim against all defendants, which is the sole claim against Camping World.

During fact discovery, Camping World served Plaintiffs with interrogatories, seeking facts upon which they base their negligence claim. [ECF No. 77-1 at 3–5 ("Interrog. Nos. 3–5").] Plaintiffs objected to the interrogatories as a premature attempt to elicit expert opinion and testimony, stating that the answers would be supplemented. (*Id*.) Plaintiffs never supplemented these answers, and fact discovery ended on April 1, 2019. [ECF No. 22.]

Plaintiffs then submitted an expert report prepared by Orion P. Keifer and Peter D. Layson. [ECF No. 77-1 at 21–172 ("AEGI Report").] The AEGI Report concludes that "[t]he HTS thermocouple was properly installed in accordance with Norcold's procedures, the HTS module and wiring was correctly placed by a knowledgeable Norcold certified technician," and "[t]he HTS, though properly installed, did not prevent failure in the fire mode." (*Id*. at 21.) Plaintiffs never supplemented their expert report. The deadline for expert discovery was August 26, 2019.

On September 19, 2019, the Norcold Defendants filed a motion for partial summary judgment. [ECF No. 58.] On October 11, 2019, Camping World filed its motion for summary judgment, also joining the Norcold Defendants' motion for partial summary judgment. [ECF No. 74.] The parties agree that Minnesota substantive law applies to the claims at issue. For the reasons that follow, the Court grants both motions.

## ANALYSIS

### I.  Plaintiffs' Objection to Rachel's Medical Records

As an initial matter, Plaintiffs object to the Norcold Defendants' use of Rachel's medical records in support of their motion for partial summary judgment. [ECF No. 72.] Plaintiffs argue that the medical records should be stricken because they were not properly authenticated and are inadmissible hearsay. The Court disagrees. Medical records are an exception to the hearsay rule under Rule 803(4) of the Federal Rules of Evidence, "Statement Made for Medical Diagnosis or Treatment." The medical records include a Certification of Medical Record Copy from HCMC (Defs' Ex. F at HCMC 3), and were attached to an affidavit from the Norcold Defendants' counsel, who attests that Exhibit F is a true and correct copy of the medical records from HCMC. [ECF No. 60 ¶ 9.] The Court finds that the medical records were authenticated under Rule 901(b)(1) of the Federal Rules of Evidence. For these reasons, Plaintiffs' objection to their use is overruled.

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (citation omitted). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *Id*. (quoting *Celotex*, 477 U.S. at 322–23).

## III.     The Norcold Defendants' Motion for Partial Summary Judgment

### A.     *Physical injury claim*

The Complaint alleges Rachel suffered physical injuries, yet Rachel testified that she was not physically injured by the fire. Plaintiffs did not respond to this argument in their opposition to the motion, and at oral argument, Plaintiffs' counsel conceded that

their physical injury claim is not supported by the record. Therefore, their claim for damages based on physical injury is dismissed.

**B.      *Emotional distress claim based on fear for another's safety***

Defendants move to dismiss Plaintiffs' claim of emotional distress, brought by Rachel based on her alleged fear for another's safety. To recover damages for distress caused by fearing for another's safety, a plaintiff must establish that the defendant's negligent conduct "caused serious bodily injury to the third-party victim." *Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 770–71 (Minn. 2005). While Rachel testified that she was worried about the children, neighbors, and her family, it is undisputed that no one was injured by the fire. (Rachel Dep. I at 113.) Plaintiffs did not respond to this argument in opposing this motion, and at oral argument, Plaintiffs' counsel conceded that no one was physically injured as a result of the fire. Because Plaintiffs have not raised a genuine issue of material fact as to their claim of emotional dismiss based on fear for another's safety, any claim for damages based on this ground is dismissed.

**C.      *Emotional distress claim based on fear for one's own safety***

Defendants also move to dismiss Plaintiffs' claim for emotional distress based on Rachel's fear for her own safety.[5] To state a claim for negligent infliction of emotional distress ("NEID"), a plaintiff must prove the four elements of a negligence claim: "(1) the

---

[5] Plaintiffs offer no evidence of any emotional distress of William Stewart, who was not present at the time of the fire.

existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury." *Engler*, 706 N.W.2d at 767. A plaintiff must also prove that she "(1) was within the zone of danger of physical impact [created by the defendant's negligence]; (2) reasonably feared for her own safety; and (3) [consequently] suffered severe emotional distress with attendant physical manifestations." *Id.* (citation omitted). Defendants assert that Rachel's NEID claim should be dismissed because Plaintiffs fail to raise a genuine issue of material fact as to whether (a) the RV fire caused Rachel's alleged emotional distress, (b) Defendants placed Rachel in the zone of danger, and (c) Rachel's physical manifestations support an NEID claim. Because Rachel fails to offer sufficient proof of causation to survive summary judgment, the Court need not reach the issues of zone of danger or physical manifestation.

To prove a negligence claim, a plaintiff must prove injury and a causal connection between the injury and the event sued upon. *In re Baycol Prods. Litig.*, 321 F. Supp. 2d 1118, 1124–25 (D. Minn. 2004) (citing *M.M.D. v. B.L.G.*, 467 N.W.2d 645, 646 (Minn. Ct. App. 1991)). Courts are to "carefully scrutinize evidence presented by plaintiffs in support of their claims regarding the cause and the severity of alleged emotional distress absent a contemporaneous physical injury." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 440 n.9 (Minn. 1983). Medical expert testimony "is not necessary in every personal injury action to establish a causal connection between the defendant's negligent act and the plaintiff's injury." *M.M.D.*, 467 N.W.2d at 647. But where a question involves "obscure

and abstruse medical factors such that the ordinary layman cannot reasonably possess well-founded knowledge of the matter and could only indulge in speculation," there must be expert testimony "that the thing alleged to have caused the result not only might have caused it but in fact did cause it." *Gross v. Victoria Station Farms, Inc.*, 578 N.W.2d 757, 762 (Minn. 1998) (citation omitted); *e.g., Willert v. Ortho Pharm. Corp.*, 995 F. Supp. 979, 983 (D. Minn. 1998) (granting summary judgment for failure to prove causation after excluding expert testimony where plaintiff claimed that medicine caused his injury); *e.g. Hahn v. Minn. Beef Indus., Inc.*, No. 00-CV-2282 (RHK/SRN), 2002 WL 32658476, at *3 (D. Minn. May 29, 2002) ("Depression and anxiety disorder are complex injuries, requiring expert (as opposed to lay) testimony regarding diagnosis and causation."). Rachel offers no expert testimony establishing a causal link between the RV fire and her emotional distress. Her treating medical doctors are unwilling to testify as experts in this matter.

Plaintiffs argue that they do not need expert testimony to prove the causal connection between Rachel's emotional distress and the RV fire. They claim that Rachel's own testimony is sufficient to avoid summary judgment. Indeed, there are some cases that do not require expert testimony to prove a causal connection between an event and emotional distress. In support of this proposition, Plaintiffs cite *Adams v. Toyota Motor Corp.*, No. 10-CV-2802 (ADM/JSM), 2015 WL 3742898, at *12 (D. Minn. June 15, 2015), *aff'd in part, rev'd in part*, 867 F.3d 903 (8th Cir. 2017). There, the plaintiff was a passenger in car involved in a high-speed crash that resulted in the death of the driver. The *Adams*

court explained, "[e]xpert medical testimony is not needed here because it is common sense that the question of whether a life-altering high speed fatal crash may cause emotional distress is not a factor beyond the knowledge of the average layperson." *Id*.

The Court finds *Adams* factually distinguishable. No one was killed or injured in the RV fire. And the events described in the record are more akin to those in which courts required expert testimony to establish a causal connection between the event and the alleged emotional distress. *E.g.*, *Wittwer v. Enbridge, Inc.*, No. A06-1049, 2007 WL 152533, at *2–*3 (Minn. Ct. App. Jan. 23, 2007) (affirming summary judgment on emotional distress claim for lack of evidence of causal link between plaintiff's emotional distress and a blast that caused no physical injury); *Patterson v. Wu Family Corp.*, 594 N.W.2d 540, 550 (Minn. Ct. App. 1999), *rev'd on other grounds*, 608 N.W.2d 863 (Minn. 2000) (establishing a causal connection between defendant's alleged assault and battery of plaintiff and plaintiff's symptoms—including a phobia of public places, high blood pressure, dizziness, sweating, and headaches—"required an understanding of medical factors beyond that of the average layperson," *i.e.*, expert medical testimony, to establish causation); *see also Hahn*, 2002 WL 32658476, at *3 ("Given the complexities of the mental conditions at issue in this case, neither Hahn nor her husband nor any other lay witness may testify about their beliefs as to how Hahn's alleged emotional distress injuries were caused" in an employment discrimination case). The court in *Wittwer* explained Minnesota law as follows:

> In a case involving a claim of damages for emotional distress where causation was at issue, [the Minnesota] [S]upreme [C]ourt held that "testimony from the individual making the claim . . . [is] not sufficient to establish a causal connection between the conduct and the emotional distress. The appropriate method of proving the severity and causation of emotional distress is through medical testimony." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 869 (Minn. 2003) (citations omitted) (involving symptoms such as stomach pain, impotence, and hair and weight loss).

*Wittwer*, 2007 WL 152533, at *2; *see also id.* at *3 ("[Plaintiff] is not qualified through her own nonexpert testimony to supply the causal link between the blast and her symptoms"). Without any medical expert testimony, Rachel's testimony as to the cause of her emotional distress "fails to provide the 'guarantees of trustworthiness' necessary to overcome the speculative nature of this claim because [the Court] cannot be certain of the extent of her distress and can only speculate as to its source." *Id.* at *3 (quoting *Deli v. Univ. of Minn.*, 578 N.W.2d 779, 783 (Minn. Ct. App. 1998)).

To further buttress the point that expert testimony is necessary, Rachel's medical records indicate several plausible causes of her emotional distress. These include not just the RV fire, but also tax audits, the health of other family members, legal and financial issues, as well as prior diagnoses of anxiety and PTSD. This record makes proving causation particularly complex, requiring something other than Rachel's own testimony. For these reasons, the Court finds that Plaintiffs fail to raise a genuine issue of material fact as to the causal connection between the RV fire and Rachel's alleged emotional distress. Plaintiffs' claim of negligent infliction of emotional distress is therefore dismissed.

**IV.    Camping World's Motion for Summary Judgment**

**A.    *The Keifer Affidavit***

In response to Camping World's motion for summary judgment, Plaintiffs submitted the affidavit of Orion Keifer, one of the experts who prepared the AEGI Report. [ECF No. 87-7 ("Keifer Affidavit").] The Keifer Affidavit attempts to modify the AEGI Report's broad and unambiguous conclusion the HTS was "properly installed in accordance with Norcold's procedures" and "correctly placed by a knowledgeable Norcold certified technician." (AEGI Report at 21.) Keifer now opines the opposite—that Divine failed to comply with the HTS Instructions and damaged the clamp band during installation, and that such damage caused the failure of the clamp band. (Keifer Aff. ¶¶ 8–9.)

Not surprisingly, Camping World seeks to exclude the Keifer Affidavit under Rules 26 and 37 of the Federal Rules of Civil Procedure. Rule 26(a)(2) requires "a complete statement of all opinions the [expert] witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Supplements must be made "in a timely manner." Fed. R. Civ. P. 26(e)(1)(A). Rule 37 states that if a party fails to provide information required by Rule 26(a) or (e), the party is not allowed to use the evidence on a motion, at a hearing or at trial, unless the failure is substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *see also id.* advisory committee's note to 1993 amendment (Rule 37(c) is "a self-executing sanction for failure to make a disclosure required by Rule 26(a)"). As the Eighth

Circuit has noted, "failure to disclose in a timely manner is equivalent to failure to disclose." *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998); *e.g. Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 704 (8th Cir. 2018) (affirming exclusion of expert testimony for failing to adhere to Rule 26(a)(2)).

Keifer admits that his affidavit was prepared in response to Camping World's motion for summary judgment. (Keifer Aff. ¶ 6.) Plaintiffs do not explain the delay in disclosing Keifer's new opinion, or why their failure to timely supplement his expert opinion is substantially justified or harmless. Camping World would be prejudiced by Plaintiffs' failure to disclose Keifer's new opinion in a timely manner because it had no opportunity to take discovery on it. Camping World did not depose Keifer because of the AEGI Report's conclusion that the HTS was properly installed in accordance with Norcold's procedures. Allowing Keifer's new opinion would require reopening discovery, resulting in additional expense to Camping World and delay in this litigation. For these reasons, the Court finds that the Keifer Affidavit is excluded under Rule 37.[6]

**B.**     *Evidence of Breach of Duty of Care and Causation*

Camping World moves for summary judgment on Plaintiffs' negligence claim, arguing that that Plaintiffs lack evidence establishing two elements required to prove negligence: (1) a breach of a duty of care, and (2) that the breach of duty was a proximate

---

[6] Because the Court finds that the Keifer Affidavit is excluded under Rule 37, it need not address Camping World's argument that the affidavit be excluded as a "sham affidavit."

cause of the injury. *Engler*, 706 N.W.2d at 767. Camping World contends that these elements require expert testimony, and summary judgment is appropriate because the experts agree that Camping World properly installed the HTS. Plaintiffs counter that an expert is unnecessary.

"Minnesota courts do not require the use of expert testimony to establish the standard of care 'where the acts or omissions complained of are within the general knowledge and experience of lay persons.'" *Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124, 1128 (D. Minn. 1998) (quoting *Atwater Creamery Co. v. West. Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985)). If, however, "it would be speculative for the fact finder to decide the issue of negligence without having the benefit of expert testimony on the standard of care, the expert testimony is necessary." *Id.* (quoting *Atwater*, 366 N.W.2d at 279).

Plaintiffs maintain that "[i]t is well within a juror's experience that if you overtighten something, you are liable to damage it." [ECF No. 86 ("Pls' Opp. Mem.") at 9.] But this proposition, even if true, does not move the dial on Plaintiffs' negligence claim, because it does not tend to prove that Camping World negligently installed the HTS or that such installation caused the RV fire. In an effort to prove Camping World's negligence, Plaintiffs cobble together: the fact that the HTS's purpose was to prevent fires; the HTS Instructions; Norcold's corporate witness testimony that the HTS Instructions were mandatory; Divine's testimony regarding how he installed the HTS in Plaintiffs' RV refrigerator; and Camping World's corporate witness testimony that Camping World did

not have a procedure or protocol to verify that its technicians followed the HTS Instructions.[7] They contend that Divine's testimony supports their negligence claim because he failed to follow the HTS Instructions by: (1) not using a torque wrench; (2) "ignor[ing]" the torque specification; and (3) bending the HTS clamp to fit it to the refrigerator's boiler tube. (*Id*. at 8.) Plaintiffs maintain these "violations" were material because the HTS Instructions were designed to prevent damage to the HTS clamp, which in turn would render the HTS inoperable. Divine allegedly knew that failing to follow the instructions could cause an RV refrigerator fire, and exposed Plaintiffs to a foreseeable risk of harm by violating the instructions.

Plaintiffs offer no evidence that Divine overtightened the HTS clamp, nor any evidence that a broken HTS clamp caused the RV fire. Instead, they maintain that: Divine fitted an undamaged HTS to their RV refrigerator; the clamp was found broken after the fire; and Divine was the only person to touch the HTS between its installation and the

---

[7] Plaintiffs do not cite their own deposition testimony in support of their negligence claim against Camping World. Nor can they. Rachel testified she was not aware of anything that Camping World did or did not do that caused or contributed to the fire. (Rachel Dep. II at 228–29.) Similarly, William Stewart testified that he did not know what Camping World did or did not do to cause or contribute to the fire. (William Dep. at 85.) *E.g. Grant v. J.C. Penney Corp.*, No. 02-CV-4343 (RHK/RLE), 2003 WL 22996915, at *12 (D. Minn. Dec. 18, 2003) ("[I]t is apparent from [plaintiff's] deposition testimony that she can only speculate as to what caused her to fall. This is insufficient to sustain a negligence claim.").

fire.[8] (*Id*. at 10.)[9] Based on this evidence, Plaintiffs claim that the average person can determine if Divine's failure to follow the HTS Instructions led to the failure of the HTS and the fire.

Whether Camping World negligently installed the HTS and whether such installation caused the RV fire are complex questions requiring expert opinion. *E.g., Szanto v. Target Corp.*, No. A09-109, 2010 WL 346297, at *8 (Minn. Ct. App. Feb. 2, 2010) (rejecting argument that causation could be proved by plaintiff's testimony in products liability case arising out of allegedly defective eye drops, finding "complex questions of causation" requiring an expert opinion). Lay persons are not generally knowledgeable about—and have no experience with—RV refrigerator repair or installation of thermocouples on boiler tubes. Without the benefit of expert testimony, it would be speculative for a factfinder to determine negligence and causation. Plaintiffs' position during discovery supports this conclusion, as they objected to deposition questions and

_____

[8] The Court notes that Plaintiffs have not asserted a claim based on the *res ipsa loquitor* doctrine. *Bossons v. Hertz Corp.*, 176 N.W.2d 882, 885 (Minn. 1970) ("[T]he [*res ipsa loquitor*] doctrine is inapplicable if the accident may reasonably be attributable to one or more causes for which defendant is not responsible.").

[9] Plaintiffs assert that "the degree of corrosion on the broken muffler clamp demonstrated that the fracture occurred prior to the fire." (Pls' Opp. Mem. at 10.) The Court disregards this assertion because its only basis is the Keifer Affidavit, which is excluded under Rules 26 and 37. (*See id*. at 7 (citing Keifer Aff.).) In contrast, the AEGI Report states in part: "The HTS clamp band was fractured at the time of the AEGI inspection. Review of photographs suggest that the fracture may have occurred *after* the scene inspection [*sic*] . . . ." (AEGI Report at 8 (emphasis added).)

interrogatories regarding the basis of their negligence claim against Camping World as "a premature attempt to elicit expert opinion and testimony." (Interrog. Nos. 3–5; *see* Rachel Dep. II at 228; William Dep. at 85.)

Indeed, the only evidence in the record is that Camping World "properly installed" the HTS. This was the conclusion of Plaintiffs' experts and Camping World's expert. (AEGI Report at 21 (concluding the "HTS thermocouple was properly installed in accordance with Norcold's procedures," and "the HTS module and wiring was correctly placed by a knowledgeable Norcold certified technician"); ECF No. 77-1 at 178 (Thomas W. Fribley's expert report concluding that "[t]he HTS thermocouple was properly installed by Camping World in accordance with Norcold procedures").) Plaintiffs' negligence claim is not supported by any expert opinion properly before this Court.[10] "[S]ummary judgment is appropriate where . . . an expert opinion is required to establish an element of a plaintiff's case and the plaintiff fails to produce such an opinion." *Schiffler v. Home Depot USA, Inc.*, No. 07-CV-4303 (JRT/LIB), 2013 WL 980334, at *7 (D. Minn. Feb. 15, 2013), *R&R adopted*, 2013 WL 980330 (D. Minn. Mar. 13, 2013). Because Plaintiffs fail to produce expert opinion evidence supporting their negligence claim in a timely manner, summary judgment in favor of Camping World is appropriate.

---

[10] Plaintiffs argue—without citing any case law—that Camping World's claim that Plaintiffs' experts absolve it of liability is based on a misunderstanding of the issues involving the HTS installation. They rely on the Keifer Affidavit to argue that the AEGI Report does not absolve Camping World of liability. Because the Keifer Affidavit is excluded under Rules 26 and 37, the Court disregards this argument.

Even if expert testimony were not required, Plaintiffs' proffered evidence fails to raise a genuine issue of material fact as to causation. "The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility of injury from defendant's acts. It must be more than merely consistent with plaintiff's theory of how the accident occurred." *Grant*, 2003 WL 22996915, at *4 (quoting *Elias v. City of St. Paul*, 350 N.W.2d 442, 444 (Minn. Ct. App. 1984)); *e.g.*, *Nelson v. Navistar Int'l Corp.*, No. 10-CV-137 (JRT/SER), 2011 WL 5374438, at *6 (D. Minn. Nov. 7, 2011) (granting summary judgment where the only evidence of a causal connection was the temporal proximity of falling debris and plaintiff's injuries, which was "too attenuated to support a finding that the defect was the proximate cause of [the] injuries"). Plaintiffs do not offer proof supporting a causal connection between the installation of the HTS and the RV fire beyond the point of conjecture. Summary judgment is therefore appropriate. *E.g. Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060–61 (8th Cir. 2005) (affirming summary judgment because plaintiff could not prove that a product defect caused a fire where court excluded expert opinions and plaintiff presented no other evidence of a defect); *Vanderberg*, 906 F.3d at 708 (affirming summary judgment and holding claims failed under Iowa law because of the lack of expert opinion evidence establishing a genuine issue of material fact on causation, where district court excluded expert testimony).

# CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.  The Norcold Defendants' Motion for Partial Summary Judgment [ECF
    No. 58] is GRANTED;

2.  Plaintiffs' objection to the Norcold Defendants' Exhibit F [ECF No. 72] is
    OVERRULED;

3.  Camping World's Motion for Summary Judgment and Joinder to the
    Norcold Defendants' Motion for Partial Summary Judgment [ECF No. 74]
    is GRANTED; and

4.  Camping World is DISMISSED from this case.

Dated: March 16, 2020                     BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge